## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| **ANNA M. HARRIS, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO:** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TANNER MEDICAL CENTER, INC.,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | | |

## COMPLAINT

## PRELIMINARY STATEMENT

Anna M. Harris, M.D. ("Dr. Harris"), by this legal action, seeks relief for the substantial injuries that Defendant has caused her to incur. Dr. Harris seeks monetary damages for Defendant's gender discrimination that has caused her  loss of employment advancement and opportunities; loss of pay and benefits including lost insurance coverage as well as extreme stress, humiliation, embarrassment, mental anguish, and damage to her reputation for all of which she seeks relief as deemed appropriate to serve the interests of justice and to assure that her remedies are full and complete.

Defendant's intentional and wrongful gender discrimination is simple and shocking. Defendant, acting as if it was 1820 or 1920 rather than 2020, intentionally engaged in gender discrimination against Dr. Harris. Defendant, solely because of Dr. Harris' sex, refused to hire Dr. Harris for Defendant's Radiation Oncology Department's Director position ("Director Position").

Dr. Harris, a Radiation Oncologist, employed by Defendant for eight years, had exhibited abundant ability as a Radiation Oncologist and had a proven track record of providing superb patient care. Moreover, the Radiation Oncology Department, during Dr. Harris' employment, had been immensely profitable.

Simply stated, Dr. Harris, who had exhibited top quality professional performance, was the most qualified person for the Director Position. Defendant, however, refused to consider, much less hire, Dr. Harris for the Director Position because of her sex.

No legitimate excuse or justification exists for Defendant's intentional gender discrimination. Accordingly, Dr. Harris is entitled to compensatory and punitive damages in addition to being hired for the Director Position. In addition, Dr. Harris is entitled to recover her costs of litigation including attorney's fees and expert fees. And Dr. Harris is entitled to declaratory and injunctive relief, if such relief is necessary to provide Dr. Harris a full and complete remedy for Defendant's violation of her rights.

In addition, Defendant has breached its contractual commitment to pay supplemental compensation owed to Dr. Harris. And Defendant has done so in bad faith.

Dr. Harris, on her pendent state law breach of contract claim, is entitled to compensatory damages, including pre-judgment interest. Dr. Harris, because of Defendant's bad faith conduct in connection with breaching her employment contract, is entitled to recover her costs of litigation including attorney's fees.

## TABLE OF CONTENTS

A.    Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    Dr. Harris' Top Quality Patient Care . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.    Defendant's Radiation Oncology Department, During Dr. Harris'
        Employment, was Extraordinarily Profitable . . . . . . . . . . . . . . . . . . 4

    3.    Defendant Forced the Radiation Oncology Department's Director to
        Resign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    4.    Defendant, by Forcing the Radiation Oncology Department's Director
        to Resign, Created a Need for a New Director . . . . . . . . . . . . . . . . . 8

    5.    Dr. Harris was the Most Qualified Person to be the Radiation
        Oncology Department's Director . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    6.    Defendant Rebuffed Dr. Harris' Expressed Desire to be the Radiation
        Oncology Department's Director . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    7.    Dr. Harris' Unofficial and Invalid Resignation Letter . . . . . . . . . . . 13

    8.    Defendant's Retaliation Against Dr. Harris for Expressing Concern
        about Unsafe Patient Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    9.    Defendant's Intentional Gender Discrimination . . . . . . . . . . . . . . . 17

    10.   Dr. Harris has Complied with the Prerequisites for Bringing Suit . . 24

D.    Count One: Defendant's Violation of Dr. Harris' Rights under Title VII... 26

E.    Count Two: Defendant's Breach of Supplemental Compensation
      Contractual Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

F.    Jury Demand. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## JURISDICTION AND VENUE

1.

The Court, pursuant to 28 U.S.C. 1331, has jurisdiction over Defendant and the subject matter of Dr. Harris' federal civil rights claim based upon Title VII of the Civil Rights Act of 1964 42 U.S.C. 2000e et. seq. as amended by the Civil Rights Act of 1991. The Court, pursuant to 28 U.S.C. 1367, has supplemental jurisdiction over Dr. Harris' pendent state law breach of contract claim.

2.

Although Dr. Harris seeks monetary damages, Dr. Harris, also, invokes this Court's jurisdiction under the Declaratory Judgment Act, 28 U.S.C. 2201, et. seq., as Dr. Harris seeks declaratory and injunctive relief if such relief is deemed necessary and desirable and in the interests of justice to provide Dr. Harris a full and complete remedy for Defendant's violation of her rights.

3.

Venue, pursuant to 28 U.S.C. 1391, is proper in this judicial district. Defendant resides in this judicial district and Defendant's wrongful acts giving rise to Dr. Harris' claims occurred in this judicial district.

## PARTIES

### 4.

Plaintiff Anna M. Harris, M.D. ("Dr. Harris"), a Board certified Radiation Oncologist, is licensed to practice medicine by the State of Georgia.

### 5.

Defendant Tanner Medical Center, Inc., ("Defendant") is a medical health care provider, who owns and operates multiple hospitals, several clinics and numerous medical practices, with its principal place of business at 705 Dixie Street, Carrollton, Georgia.

## FACTS

### 1.

### DR. HARRIS' TOP QUALITY PATIENT CARE

### 6.

Defendant, from approximately July 2, 2012 until May 31, 2020, employed Dr. Harris as a Radiation Oncologist at Defendant's hospital in Carrollton, Georgia.

### 7.

Dr. Harris, at all material times, was a superb top flight Radiation Oncologist.

- 2 -

8.

Dr. Harris advocated excellent patient care.

9.

Dr. Harris placed her patients' care and safety first.

10.

Dr. Harris provided top quality patient care.

11.

Dr. Harris, in treating patients, acted with a very high degree of competence.

12.

Dr. Harris, in treating patients, acted in a very conscientious manner.

13.

Dr. Harris, in treating patients, acted in a very caring manner.

14.

Dr. Harris' Radiation Oncologist career, at Defendant's hospital, was unblemished with any medical negligence claim or any other complaint about her medical care.

15.

Dr. Harris, in addition to having an unimpeachable record as a Radiation

Oncologist, always was courteous, dignified and very professional in her

interactions with patients and their families.

**2.**

**DEFENDANT'S RADIATION ONCOLOGY DEPARTMENT, DURING
DR. HARRIS' EMPLOYMENT, WAS
<u>EXTRAORDINARILY PROFITABLE</u>**

16.

Defendant, July 2, 2012, hired Dr. Harris to be a Radiation Oncologist.

17.

Dr. Harris, for approximately eight years, worked with J. Richard Bland,

M.D. ("Dr. Bland") as a Radiation Oncologist at Defendant's Carrollton hospital.

18.

Dr. Bland, who had started Defendant's Radiation Oncology Department,

was the Department's Director.

19.

Dr. Bland and Dr. Harris were the only two employed physicians in

Defendant's Radiation Oncology Department.

20.

Defendant's  Radiation Oncology Department, during Dr. Harris' employment, was immensely profitable.

21.

The Radiation Oncology Department's net patient revenue from physician fees, during Dr. Harris' employment, was as follows:

| | |
|------|-----------------|
| 2012 | $948,054.00; |
| 2013 | $1,070,744.00; |
| 2014 | $1,089,661.00; |
| 2015 | $1,083,437.00; |
| 2016 | $1,331,256.00; |
| 2017 | $1,248,449.00; |
| 2018 | $1,356,619.66; and |
| 2019 | $1,369,687.29 |

22.

Defendant's Radiation Oncology Department, from 2012-2019, during Dr. Harris' employment, generated $9,497,957.95 net patient revenue from physician fees.

23.

In addition to physician fees, Defendant's Radiation Oncology Department, during Dr. Harris' employment, generated millions of dollars in profits from technical and facility fees.

24.

Defendant has attempted to conceal its Radiation Oncology Department's generated technical and facility fees.

25.

Defendant's attorney, in an email August 5, 2020, falsely stated: "[Defendant] does not create or maintain documents that attribute technical and facility fees to the Radiation Oncology Department."

26.

Defendant's Radiation Oncology Department's technical fees for 2019 were $11,439,346 with a profit of $9,314,069.

27.

Defendant's Radiation Oncology Department, during 2019, generated a net profit of $10,683,756.30 (physician fees, technical fees and facility fees).

28.

The sophisticated procedures that Dr. Harris added to the Radiation

Oncology  Department's services generated a significant portion of the

Department's technical and facility fees.

29.

Dr. Harris consistently, year after year, was one of Defendant's most

profitable doctors.

**3.**

**DEFENDANT FORCED THE RADIATION ONCOLOGY
DEPARTMENT'S DIRECTOR TO RESIGN**

30.

Defendant, January 15, 2020, for reasons completely unrelated to patient

care, forced Dr. Bland to resign as an employee and as the Radiation Oncology

Department's Director.

31.

Dr. Harris was not involved whatsoever in the activity giving rise to Dr.

Bland's forced resignation.

32.

Defendant had no reason to believe that Dr. Harris was involved in the

activity giving rise to Dr. Bland's forced resignation.

- 7 -

33.

Defendant did not accuse Dr. Harris of being involved in the activity giving rise to Dr. Bland's forced resignation.

34.

Dr. Bland's forced resignation became effective January 17, 2020.

**4.**

**DEFENDANT, BY FORCING THE RADIATION ONCOLOGY DEPARTMENT'S DIRECTOR TO RESIGN, CREATED A NEED FOR A NEW DIRECTOR**

35.

Defendant, after forcing Dr. Bland to resign, needed a Director for its Radiation Oncology Department.

36.

The Georgia Department of Human Resources requires each Radiation Oncology Department to have "One (1) program director, who shall be a board-certified physician trained in radiation oncology...; and who shall be available by means of direct communication with the non-special MRT unit in person or by radio, telephone, or telecommunication." (Emphasis supplied.)

**5.**

## DR. HARRIS WAS THE MOST QUALIFIED PERSON TO BE THE RADIATION ONCOLOGY DEPARTMENT'S DIRECTOR

37.

Dr. Harris, because of her exemplary patient care and profitable performance during the eight years employed as a Radiation Oncologist by Defendant, was the most logical person to replace Dr. Bland as Defendant's Radiation Oncology Department's Director.

38.

Dr. Harris, based upon her exemplary and sterling professional track record, was undeniably the most qualified person to succeed Dr. Bland as the Director of Defendant's Radiation Oncology Department.

39.

Dr. Harris, at 40 years old, was entering the apex period of her professional career with many productive years on the horizon.

40.

Dr. Harris had been a highly dedicated and loyal employee.

41.

Dr. Harris, as an employee, had exhibited excellent professional ability and a great attitude.

42.

There was no legitimate or logical reason for Defendant to refuse to hire Dr. Harris as the Radiation Oncology Department's Director.

43.

Dr. Harris, based upon her outstanding record, was the Director Position's best candidate.

44.

Defendant, if acting in a non-discriminatory manner, would have hired Dr. Harris to be the Radiation Oncology Department's Director.

**6.**

**DEFENDANT REBUFFED DR. HARRIS' EXPRESSED DESIRE TO BE THE RADIATION ONCOLOGY DEPARTMENT'S DIRECTOR**

45.

Dr. Harris, during the first part of 2020,  reached out several times to Defendant's CEO, and his subordinates, about the Director Position.

46.

Dr. Harris told Defendant's agents that she had several ideas to improve the Radiation Oncology Department's performance.

47.

Defendant's agents, because of Defendant's gender discrimination, turned a deaf ear to Dr. Harris.

48.

Defendant, because of its gender discrimination, never asked Dr. Harris about her ideas to improve the Radiation Oncology Department.

49.

Defendant's CEO and his subordinates, for the most part until they rejected Dr. Harris' proposed contract to direct the Radiation Oncology Department, studiously and stubbornly avoided addressing Dr. Harris' desire to be in charge of the Radiation Oncology Department's operations.

50.

Dr. Harris, February 14, 2020, orally proposed a professional services agreement for her to direct the Radiation Oncology Department.

51.

Defendant, because of its blatant gender discrimination, refused to consider Dr. Harris' oral proposed professional services agreement to direct the Radiation Oncology Department.

52.

Dr. Harris, April 24, 2020, submitted a written proposed professional services agreement to direct the Radiation Oncology Department.

53.

Defendant, again, because of its blatant gender discrimination, refused to consider Dr. Harris' proposal to direct the Radiation Oncology Department.

7.

## DR. HARRIS' UNOFFICIAL AND INVALID
## RESIGNATION LETTER

54.

The Radiation Oncology Department, during the early part of 2020, was experiencing serious patient care issues because of lacking a Director and the problematic behavior of its supervisor, a non-physician employee, making decisions far beyond the scope of her competence.

55.

Dr. Harris, because of the Radiation Oncology Department being mismanaged by a totally unqualified non-physician, sent an "unofficial" resignation letter to Defendant's Chief Administrative Officer William Hines ("Mr. Hines") to trigger negotiations for her to be the Director of the Radiation Oncology Department.

56.

Mr. Hines works primarily in California, where he resides.

57.

Mr. Hines, because of living in California with limited time spent in Carroll County, is often unavailable to meet with or communicate with doctors who practice at Defendant's Carrollton hospital.

58.

Mr. Hines often communicated, with doctors at Defendant's Carrollton hospital, through his assistant Gwen Green.

59.

Mr. Hines' assistant Gwen Green, after conferring with Mr. Hines about Dr. Harris' "unofficial" resignation letter, told Dr. Harris that her resignation letter was "invalid."

60.

Dr. Harris, after Gwen Green's statement that her resignation letter was "invalid," proceeded with her employment with Defendant and scheduled a meeting for February 14, 2020 to discuss the Radiation Oncology Department's operations, the first time Defendant's management would meet with Dr. Harris.

**8.**

## DEFENDANT'S RETALIATION AGAINST DR. HARRIS FOR EXPRESSING CONCERN ABOUT POOR PATIENT CARE

61.

Defendant, after forcing Dr. Bland to resign, improperly allowed Mrs. Brat, to supervise the Radiation Oncology Department.

62.

After Dr. Bland's forced resignation, the Radiation Oncology Department's therapists, nurses and other clinical staff reported to Mrs. Brat.

63.

Mrs. Brat, previously a pharmaceutical sales representative, has no medical training.

64.

Mrs. Brat was obviously unqualified to supervise the Radiation Oncology Department's radiation therapists, nurses and other clinical staff.

65.

With Mrs. Brat mismanaging the Radiation Oncology Department, there were multiple patient care and safety misadventures because of the Department's poor management and unsafe practices.

66.

The Radiation Oncology Department had multiple near misses (wrong

locations) with procedures performed by  locum tenens physicians inappropriately

overseen by Mrs. Brat, who was totally unqualified to supervise physicians.

67.

Dr. Harris, during the latter part of January 2020, complained to

Defendant's management about Mrs. Brat's inappropriate power and authority

 with regard to the Radiation Oncology Department.

68.

Dr. Harris, March 4, 2020, complained to Defendant's management about

the gross negligence of a locum tenens physician working in the Radiation

Oncology Department, that placed a patient's safety at great risk.

69.

Defendant, later that same day March 4, 2020, without any discussion with

Dr. Harris, immediately upon Dr. Harris expressing her very sincere and legitimate

concern about the locum tenens' problematic medical practices that included

unsafe patient care, accepted Dr. Harris' "invalid" resignation.

70.

Defendant has never explained how Dr. Harris' "invalid" resignation, months earlier, spontaneously became valid and acceptable immediately upon Dr. Harris' legitimate criticism of the locum tenens' problematic conduct that placed a patient's safety and well being at risk.

71.

Defendant accepted Dr. Harris' "invalid" resignation in retaliation for her legitimate complaints and concerns that Mrs. Brat's mismanagement of the Radiation Oncology Department was placing patients' care and safety at risk.

**9.**

**DEFENDANT'S INTENTIONAL GENDER DISCRIMINATION**

72.

Dr. Harris, in pursuing of the Radiation Oncology Department's Director Position, was swimming against the rip current of Defendant's gender discrimination.

73.

Despite Dr. Harris being on call 24/7 for several months following Dr. Bland's forced resignation, Defendant failed and refused to consider Dr. Harris' proposal to be the Director.

- 17 -

74.

Dr. Bland, because of a vacation and being under investigation by Defendant's management for a matter totally unrelated to patient care and totally unrelated to Dr. Harris, had not worked at Defendant's Carrollton hospital since the latter part of December 2019.

75.

Dr. Harris ran the Radiation Oncology Department throughout Dr. Bland's prolonged absence, during the latter part of December 2019 and throughout January 2020, before his forced resignation.

76.

Defendant intentionally and wrongfully never offered Dr. Harris a proposal for the Radiation Oncology Department Director Position solely because of her female gender.

77.

Defendant did not want a female to be the Radiation Oncology Department's Director.

78.

Defendant, because of its desire to have a male to be the Radiation Oncology Department's Director, refused to consider Dr. Harris for the Director Position.

79.

Defendant, because of its gender discrimination against Dr. Harris, after forcing Dr. Bland to resign, did not list Dr. Harris on the Radiation Oncology Department's organizational chart.

80.

A copy of the Radiation Oncology Department's organization chart not listing Dr. Harris is attached as Exhibit "A."

81.

Defendant acted as if impervious to Dr. Harris' right to be considered for the Director Position.

82.

Defendant, after forcing Dr. Bland's resignation, orchestrated its search for the Director Position to focus only on males.

83.

Mrs. Brat, Defendant's physician recruiter, told Dr. Harris that Defendant wanted an older male to be the Director of the Radiation Oncology Department.

84.

Dr. Harris, despite Mrs. Brat's statement, continued to pursue the Radiation Oncology Director position because she was the most qualified and logical applicant.

85.

Dr. Harris, February 14, 2020, had a meeting with Defendant's Chief Medical Officer Benjamin Camp, M.D., Mr. Hines and Mrs. Matthews.

86.

Mrs. Matthews, as the February 14, 2020 meeting was breaking up, stepped aside and told Dr. Harris that Defendant wanted an older male to be the Director of the Radiation Oncology Department.

87.

Mrs. Matthews, at the end of the February 14, 2020 meeting, in addressing Dr. Harris' concerns about the Radiation Oncology Department's poor quality of care while being mismanaged by a totally unqualified non- medically trained person, told Dr. Harris "that is why we need a male, to keep the radiation therapists in line."

88.

Mrs. Matthews' statement to Dr. Harris about Defendant needing a male to be the Radiation Oncology Department's Director was categorical and crystal clear.

89.

Mrs. Brat and Mrs. Matthews' statements, about Defendant wanting a male to be the Radiation Oncology Department's Director, reflected Defendant's gender bias.

90.

After the February 14, 2020 meeting, Dr. Harris placed her personal medical books in Dr. Bland's old office, which contained the Radiation Oncology Department's computer work space for cancer imaging and treatment planning software.

91.

Mrs. Matthews told Dr. Harris to remove her personal items from Dr. Bland's old office.

92.

Mrs. Matthews was so adamant, about Dr. Harris removing her personal items from Dr. Bland's old office, that she called twice, texted and then personally came to the office to tell Dr. Harris to remove her personal items from Dr. Bland's old office.

93.

Mrs. Matthews did not want Dr. Harris to move into Dr. Bland's office because Defendant did not plan to hire her for the Director Position and did not want the staff to perceive Dr. Harris was in charge of the Department.

94.

Defendant's CEO Loy Howard, Chief Medical Officer Benjamin J. Camp, M.D. and Chief Nursing Officer Mrs. Matthews, during their May 29, 2020 "exit" interview with Dr. Harris, whose last day of employment was May 31, 2020, did not deny that Defendant was seeking a male to be the Radiation Oncology Department Director.

95.

Defendant, June 25, 2020, after refusing to enter into a professional service agreement with Dr. Harris for the Director Position, signed an exclusive professional services agreement with its wholly owned subsidiary Tanner Medical Group, Inc. ("TMG") for Radiation Oncology services.

96.

Defendant, the same day June 25, 2020, also, adopted a Board resolution stating that TMG's exclusive contract with Defendant to run the Radiation Oncology Department, removed Dr. Harris from the hospital's Medical Staff, because she was not employed by TMG.

97.

TMG, when entering into the exclusive professional service agreement to provide Radiation Oncology services, did not employ a Radiation Oncology physician.

98.

Defendant's contract with TMG gives TMG discretion, in the future, to name a Director of the Radiation Oncology Department.

99.

Defendant, July 8, 2020, announced hiring a male to be the Radiation
Oncology Department's quality assurance advisor.

100.

Now more than two months after the July 8, 2020 announcement, the male
hired to be the Radiation Oncology Department's quality assurance advisor has
not started his employment with Defendant.

## 10.

## DR. HARRIS HAS COMPLIED WITH THE PREREQUISITES FOR BRINGING SUIT

101.

Dr. Harris, at all material times, was an "employee" covered by Title VII of
the Civil Rights Act of 1964.

102.

Dr. Harris, as an employee covered by Title VII, had a federally created
right to be evaluated, for the Radiation Oncology Department's Director Position,
based on her qualifications and not to be discriminated against because of her sex.

103.

Defendant, at all material times, was an "employer," covered by Title VII of the Civil Rights Act of 1964.

104.

Defendant, as an employer covered by Title VII, in hiring the Radiation Oncology Department's Director, had a duty not to discriminate against Dr. Harris because of her sex.

105.

Dr. Harris has made a timely charge of sex discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC").

106.

The EEOC has given Dr. Harris a right to sue letter.

107.

Dr. Harris' right to sue letter is attached as Exhibit "B."

108.

Dr. Harris has filed this suit in a timely manner after receiving her right to sue letter.

## COUNT ONE

## DEFENDANT'S VIOLATION OF
## DR. HARRIS' RIGHTS UNDER TITLE VII

109.

Dr. Harris incorporates paragraphs "1" through "108" as if stated fully

herein

110.

Dr. Harris was extremely qualified for the Radiation Oncology

Department's Director Position.

111.

Dr. Harris' sterling professional qualifications for the Director Position

were unassailable.

112.

Defendant knew that Dr. Harris' professional qualifications for the Director

Position were unassailable.

113.

Defendant, despite Dr. Harris' undeniable excellent professional

qualifications, refused to consider Dr. Harris for the Director Position solely

because of her gender.

114.

Defendant refused to consider Dr. Harris for the Director of the Radiation Oncology Department, because she is a female.

115.

Defendant, in searching for a Director of the Radiation Oncology Department, impermissibly focused on gender.

116.

Defendant, in searching for a Director of the Radiation Oncology, impermissibly excluded Dr. Harris from consideration for the Director Position because of her sex.

117.

Mrs. Brat and Matthews' statements, about Defendant wanting a male for the Director Position, are incontrovertible direct evidence of Defendant's willful and unlawful intent to discriminate against Dr. Harris because of her sex.

118.

Defendant's CEO, Chief Medical Officer and Chief Nursing Officer's studied silence when Dr. Harris raised the issue that Defendant wanted a male for the Director Position, is further indisputable direct evidence of Defendant's willful and unlawful intent to discriminate against Dr. Harris because of her sex.

119.

Defendant's failure and refusal to respond to Dr. Harris' proposal for the

Radiation Oncology Department's Director Position is additional direct evidence

of Defendant's willful and unlawful intent to discriminate against Dr. Harris

because of her sex.

120.

Defendant's failure to list Dr. Harris on the Radiation Oncology

Department's organizational chart is more direct evidence of Defendant's willful

and unlawful intent to discriminate against Dr. Harris because of her sex.

121.

Defendant, by refusing to consider and hire Dr. Harris for the Radiation

Oncology Department's Director Position, because of her sex, violated Title VII.

122.

Defendant's violation of Dr. Harris' rights under Title VII is pure and

simple.

123.

Defendant's violation of Dr. Harris' rights under Title VII is beyond

legitimate debate or dispute.

- 28 -

124.

Section 703(a), of Title VII of the Civil Rights Act of 1964, states:

> <u>It shall be an unlawful employment practice for an employer</u>-
>
> (1)   <u>to fail or refuse to hire</u> . . .<u>any individual</u> . . . <u>because of such</u> individual's . . . <u>sex</u> . . . .

(Emphasis supplied.)

125.

Dr. Harris, as a result of Defendant's gender discrimination, has suffered and will continue to suffer compensatory damages, including, but not limited to, back pay, loss of pre-judgment interest on the back pay and front pay.

126.

Dr. Harris is entitled to recover compensatory damages for her substantial injuries caused by Defendant's unlawful gender discrimination.

127.

Dr. Harris is entitled to recover back pay, pre-judgment interest on her back pay and to be compensated for lost benefits such as insurance.

128.

Defendant should be directed to hire Dr. Harris for the Radiation Oncology Department's Director Position.

- 29 -

129.

Dr. Harris, if not awarded the Director Position, is entitled to front pay discounted back to present value.

130.

Dr. Harris as "front pay" is entitled to monetary damages for future economic loss (future wages) until the age of retirement.

131.

Defendant's intentional gender discrimination against Dr. Harris is as outrageous as it is appalling and intolerable.

132.

Title VII, for more than 50 years, has prohibited employers from engaging in sexual discrimination in hiring.

133.

Defendant, in connection with its deplorable and reprehensible gender discrimination against Dr. Harris, acted with callous and conscience indifference to the consequences of its unlawful gender discrimination.

134.

Defendant, in connection with its deplorable and reprehensible gender discrimination against Dr. Harris, acted with malice or reckless indifference to Dr. Harris' federally protected rights.

135.

The reprehensibility of Defendant's gender discrimination against Dr. Harris is extreme.

136.

Defendant's outrageous and unconstitutional gender discrimination against Dr. Harris makes punitive damages appropriate and necessary.

137.

Punitive damages are needed to punish Defendant for its outrageous gender discrimination that violates Title VII.

138.

Punitive damages are needed to deter Defendant and others from engaging in similar outrageous gender discrimination.

Wherefore, Dr. Harris requests the Court to enter a judgment against

Defendant:

(A)   Awarding Dr. Harris a declaratory judgment that Defendant's gender discrimination violated her rights under Title VII of the Civil Rights Act of 1964;

(B)   Awarding Dr. Harris compensatory damages, including back pay and pre-judgment interest on the back pay as well as compensation for lost benefits such as insurance, in an amount to be determined by the jury;

(C)   Awarding Dr. Harris an Order directing Defendant to hire her for the Radiation Oncology Department's Director Position and reinstating her medical staff privileges;

(D)   Awarding Dr. Harris front pay discounted back to present value, if she is not awarded the Director Position;

(E)   Awarding Dr. Harris punitive damages in an amount to be determined by the jury;

(F)   Awarding Dr. Harris all allowable litigation costs including attorney's fees and expert fees; and

(G)   Awarding Dr. Harris whatever other relief, including injunctive relief, the Court deems just and proper.

## COUNT TWO

## DEFENDANT'S BREACH OF SUPPLEMENTAL COMPENSATION CONTRACTUAL PROVISION

139.

Dr. Harris incorporates paragraphs "1" through "29" as if stated herein.

140.

Defendant has failed to provide Dr. Harris the "true up" supplemental compensation required by her contract.

141.

Defendant, August 5, 2020, in anticipation of litigation, sent a check to Dr. Harris in the amount of $48, 351.37.

142.

Defendant's lawyer, in his August 5, 2020 cover letter, erroneously and deceivingly stated that the enclosed $48, 351.37 check to Dr. Harris constituted "the final reconciliation of the compensation due to Anna Harris pursuant to her contract."

143.

Defendant, in connection with its August 5, 2020, late supplemental compensation check, withheld taxes and money for malpractice tail coverage.

144.

Defendant's late supplemental payment was woefully inadequate and did not remotely cover the amount of supplemental compensation owed to Dr. Harris.

145.

Defendant should not have withheld money, from its late partial payment to Dr. Harris, for malpractice tail coverage.

146.

Dr. Harris already had obtained retroactive malpractice coverage for the period 2012 to the present.

147.

Defendant owes supplemental income to Dr. Harris as follows minus its belated August 5, 2020 payment:

- January - March 2015 -         $       437.64;
- October - December 2015 -     $    28,565.49;
- January - March 2016 -         $    12,484.66;
- October - December 2016 -     $    30,114.96;
- January - March 2017 -         $    19,295.04;
- July - September 2018 -        $    42,816.31;
- October - December 2018 -     $    35,524.80;

- 34 -

- January - March 2019 -                    $    28,644.80;

- April - June 2019 -                       $    14,108.00; and

- January - May 2020 -                      $    76,509.12.

148.

Defendant owes at least $217,119.70 supplemental compensation to Dr. Harris.

149.

Defendant, also, pursuant to the parties' contract, owes $11,966.50 to Dr. Harris for the retroactive malpractice coverage that Dr. Harris already had obtained.

150.

Defendant, pursuant to the parties' contract, in total, owes $229,086.20 to Dr. Harris.

151.

No legitimate excuse or justification exists for Defendant's breach of Dr. Harris' contract.

152.

Defendant's breach of Dr. Harris' contract is not merely wrong but is profoundly wrong.

153.

Dr. Harris is entitled to recover compensatory damages for the damages caused by Defendant's breach of her contract.

154.

Dr. Harris' damages caused by Defendant's breach of contract were reasonably foreseeable.

155.

Defendant, in connection with breaching the contract, acted with bad faith.

156.

Defendant's bad faith conduct falls within the ambit of O.C.G.A. 13-6-11's costs of litigation and attorney's fee provision.

157.

Dr. Harris, because of Defendant's bad faith conduct, is entitled to recover her costs of litigation including attorney's fees.

158.

Dr. Harris' breach of contract damages are liquidated.

159.

Dr. Harris is entitled to pre-judgment interest on her damages caused by Defendant's breach of contract.

Wherefore, Dr. Harris requests the Court to enter a judgment against

Defendant:

(A)   Awarding Dr. Harris compensatory damages on her state law claims of at least $229,086.20, the exact amount to be determined by the jury;

(B)   Awarding Dr. Harris all allowable litigation costs including attorney's fees;

(C)   Awarding Dr. Harris pre-judgment interest; and

(D)   Awarding Dr. Harris whatever other relief the Court deems just and proper.

160.

Dr. Harris demands a jury trial on all claims triable by a jury.

**GARY BUNCH, P.C.**

By: _____

Gary Bunch
Georgia Bar Number 094612
Attorney for Plaintiff
Anna M. Harris, M.D.

208 Corporate Drive
Carrollton, Georgia 30117
(770) 836-0405

September 18, 2020

**Anna Harris**

| | |
|---|---|
| **From:** | Deborah Matthews |
| **Sent:** | Thursday, February 20, 2020 6:01 PM |
| **To:** | Anna Harris |
| **Subject:** | Fwd: Radiation Center Org |
| **Attachments:** | Radiation Center February 2020.pdf; ATT00001.htm |

For our meeting tomorrow.  See you then.

Sent from my iPad

Begin forwarded message:

> **From:** Teresa Cable <tecable@tanner.org>
> **Date:** February 20, 2020 at 3:29:48 PM EST
> **To:** Deborah Matthews <dmatthews@tanner.org>, Shellie Sherrod <ssherrod@tanner.org>
> **Subject: Radiation Center Org**
>
>
> Hopefully this one is good! ☺
>
> Tc
>
> **Teresa Cable**
> *Executive Assistant*
> TANNER HEALTH SYSTEM
> ADMINISTRATION
> 770.812.9581
> tecable@tanner.org



EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Anna Harris<br>230 Lakeshore Drive<br>Carrollton, GA 30117 | From: | Atlanta District Office<br>100 Alabama Street, S.W.<br>Suite 4R30<br>Atlanta, GA 30303 |
|---|---|---|---|

| | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 410-2020-07514 | **Regina S. Brown,**<br>**Investigator Support Asst** | **(404) 562-6837** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

| | More than 180 days have passed since the filing of this charge. |
|---|---|
| **X** | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| **X** | The EEOC is terminating its processing of this charge. |
| | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

| | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost. |
|---|---|
| | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

William M.
Batts

Digitally signed by William M. Batts
DN: cn=William M. Batts, o=EEOC,
ou, email=william.batts@eeoc.gov,
c=US
Date: 2020.08.26 11:45:26 -04'00'

**Darrell E. Graham, For**
**District Director**

09-09-2020

Enclosures(s)

*(Date Mailed)*

cc:
**Shari Gainey**
**Director of Human Resources**
**TANNER MEDICAL CENTER**
**109 Cedar Street**
**Carrollton, GA 30117**

**Gary Bunch**
**THE LAW OFFICE OF GARY BUNCH, P.C,**
**208 Corporate Drive**
**Carrollton, GA 30117**

Exhibit "B"